NS



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-498-1 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | May 27, 2010 |
| DAWUD BEY | : | 2:20 o'clock p.m. |

FILED
FEB -5 2015
MICHAEL E. KUNZ, Clerk
By____ Dep. Clerk

SENTENCING HEARING
BEFORE THE HONORABLE NORMA L. SHAPIRO
SENIOR UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Government:    CHRISTINE E. SYKES, ESQUIRE
                      DAVID E. TROYER, ESQUIRE
                      U.S. Attorney's Office
                      615 Chestnut Street
                      Suite 1250
                      Philadelphia, PA    19106

For the Defendant:    ARNOLD C. JOSEPH, ESQUIRE
                      Joseph & Associates
                      1617 John F. Kennedy Boulevard
                      Suite 1700
                      Philadelphia, PA    19103

Also Present:         Judy Hunt
                      U.S. Probation Office

- - -

Audio Operator:       Mark Rafferty

Transcribed by:       Tracey J. Williams, CET

(Proceedings recorded by For the Record Gold digital sound
recording; transcript produced by AAERT-certified
transcriber.)

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610) 623-4178



2

1         (The following occurred in open court at 2:20

2  o'clock p.m.:)

3         THE COURT:  Good afternoon.

4         ALL:  Good afternoon, your Honor.

5         THE COURT:  I'm sorry to keep you waiting, but I was

6  trying to get some rulings from the Bureau of Prisons about

7  how this sentence would play out.  Will you be seated,

8  please?

9         This is in the matter of the United States of

10  America v. Dawud Bey, and I have a presentence report and a

11  revised presentence report.  Counsel, have you both received

12  all that?

13         MR. TROYER:  Yes, your Honor.

14         MR. JOSEPH:  Yes, your Honor.

15         THE COURT:  And have you reviewed that with your

16  client?

17         MR. JOSEPH:  I have, your Honor, and we do not

18  object to the revised presentence report.

19         THE COURT:  And the Government doesn't object

20  either, as I understand it?

21         MR. TROYER:  That's correct, your Honor.

22         THE COURT:  Very well.  I also received a sentencing

23  memorandum from the Government and one on behalf of the

24  Defendant.  Have you each received each other's?

25         MR. JOSEPH:  Yes, your Honor.

1          MR. TROYER:  Yes, your Honor.

2          THE COURT:  Very well.  Did you wish to offer any

3     witnesses for the Government?

4          MR. TROYER:  No, your Honor.

5          THE COURT:  And will you have witnesses for the

6     Defendant?

7          MR. JOSEPH:  None other than the Defendant, your

8     Honor, Mr. Bey.

9          THE COURT:  Very well.  I know quite a few people

10    here.  If either of you want to introduce anyone, you may do

11    so.

12         What we'll do is hear first from the Government,

13    then from the Defendant -- from defense counsel, then the

14    Defendant.  If you wish to address the Court, you may.  And

15    then I will consult with the Probation Office and impose

16    sentence, after considering the Guidelines and the statutory

17    factors, Title 18 Section 3553(a).

18         Does the Government wish to address the Court about

19    what the sentence should be?

20         MR. TROYER:  Yes, your Honor.  And I won't repeat,

21    obviously, everything in the sentencing memorandum, I think

22    we've laid out the Government's position adequately there,

23    and I will not recount the facts and the specifics of the

24    threats, because they're -- I think they speak for

25    themselves, for the most part.

4

 1          I think what this really boils down to is that these
 2    were serious threats, they were threats against several
 3    witnesses.  Some of those witnesses -- some of those threats
 4    against some of those witnesses were taken into account in
 5    his previous sentencing, and I know that is an issue here
 6    today, but --
 7          THE COURT:  Yes, they were taken into account.  As I
 8    understand it, Judge McLaughlin imposed an additional four
 9    years as a result of those threats.
10          MR. TROYER:  Three and a half, to be specific.  It
11    was literally 42 months.  And in fact the specifics are on
12    Page 31 of the transcript --
13          THE COURT:  31 of --
14          MR. TROYER:  Pardon me --
15          THE COURT:  -- what?
16          MR. TROYER:  -- I'm sorry, Page 32 of the transcript
17    -- I mean, yeah -- no, Page 31.
18          THE COURT:  Wait a minute.  Do I have a transcript?
19          MR. TROYER:  No, but I did pull it, just in case
20    there was any question about that.  And --
21          THE COURT:  Well, do you agree it was 41 months or
22    whatever he -- 42 months?
23          MR. JOSEPH:  We believe -- we thought it was 48,
24    your Honor.
25          THE COURT:  Everybody said 48.  I'm sort of taken

5

1   aback.

2        MR. TROYER:  Well, specifically, Judge McLaughlin

3   said when she was talking about the Guidelines, she refers to

4   the prosecutor and says, "I do think that 120 months is

5   sufficient, but not more than necessary to fulfill the

6   purposes of sentencing.  That is 78 that I would have given

7   Mr. Bey for just the drugs, plus 42, and I do think that is

8   sufficient in light of everything I have heard."

9        So it seems pretty clear that she had added 42.  And

10  42 is also consistent with what we had previously stated and

11  put before the court, which was that -- and as it's reflected

12  in her order, that it was the equivalent of three levels,

13  three offense levels.  Two of those levels were done as a

14  departure and one as a variance.  I think I have that right.

15        THE COURT:  All right.  So this is a 19, right?

16        MR. TROYER:  Yes, the --

17        (Discussion held off the record.)

18        THE COURT:  We're sentencing 19, Category 2, 33 to

19  41.

20        MR. TROYER:  That's correct.

21        THE COURT:  And if you went down three, it would be

22  a 24 to 30.  So that's one way of compensating, by level

23  rather than month, but all right.

24        MR. TROYER:  All right.  One of the things, though,

25  that was not taken into account at all in the previous

1  sentencing, and something for which Mr. Bey has not yet been

2  punished, are the threats that concern Eugene Coleman.  And

3  of course we did point that out in the sentencing memorandum.

4  We --

5          THE COURT:  You said you weren't taking that into

6  account at all and it shouldn't be taken into account.  You

7  have that footnote two different places.

8          MR. TROYER:  No, that's -- I'm sure that that's not

9  -- that's not correct.  There's one -- there was an

10  additional person, an additional witness that we did not take

11  into account who was not cooperative, but as to Mr. Coleman,

12  certainly those threats were taken into -- should be taken

13  into account, and I'm quite confident that I've never said

14  anything to the contrary.

15          THE COURT:  Well, I think we'll find out, because

16  I'm quite continent -- I'm quite confident you misled the

17  Court, if that's the case, because --

18          MR. TROYER:  I think what your Honor might be

19  referring to --

20          THE COURT:  Mr. Coleman's family was murdered --

21          MR. TROYER:  Yes.

22          THE COURT:  -- so it's a very serious thing.

23          MR. TROYER:  Yes.

24          THE COURT:  And you said he wasn't charged with it

25  and you didn't take it into account.

7

1         MR. TROYER:  The arson murder.  The arson murders

2    were not taken -- he's not being accounted for.  Otherwise,

3    he'd be at a Level 43 for the murders.

4         THE COURT:  I understand.  So what was taken into

5    account?

6         MR. TROYER:  What was not taken into account, but

7    what should be, are the threats to Eugene Coleman.  That was

8    specifically pled, we specifically discussed -- I

9    specifically discussed those threats at the guilty plea

10   colloquy.  And the threats to Mr. Coleman are, again, quite

11   plain.  And the fact that this Defendant not only was

12   involved in the threats to Mr. Coleman and Mr. Coleman's

13   brother, Vernon Coleman, but the fact that those threats to

14   witnesses continued after the arson murders I think show that

15   there was -- that these threats were not empty threats, they

16   were real threats, and that this Defendant, even after the

17   arson murders, when someone else might have been taken aback

18   and said, oh, well, I had no idea that this was going to be

19   such a serious thing, he still persisted in making threats to

20   witnesses.  So those things are all, you know, extremely

21   important.

22         And the facts -- let's see, on the memorandum of

23   guilty plea, just for reference purposes, because your Honor

24   questioned our position some moments ago, on Page 4 of the

25   guilty plea memo, on the last paragraph, it specifically

8

1   states in the facts of the case, "The conspiracy commenced

2   some time in late December, 2003, when Bey first approached

3   Vernon Coleman, the twin brother of witness Eugene Coleman,

4   on the street and told him to convince Twin, Eugene Coleman,

5   to not testify against Savage." And then it goes on from

6   there.

7           So the Government has always been consistent as to

8   the threats against Eugene Coleman and the threats -- the

9   witness tampering attempts.

10          THE COURT: So, to summarize, you're charging him

11  with the threats, but not with effectuating the threats?

12          MR. TROYER: Not with effectuating the murder,

13  correct.

14          THE COURT: Well, that was the threat, wasn't it, he

15  shouldn't testify or something would happen to his family?

16          MR. TROYER: In essence, correct.

17          THE COURT: All right.

18          MR. TROYER: It's a bit, but there's -- that's quite

19  a distinction, I mean, obviously. The Defendant --

20          THE COURT: I didn't say there was no distinction,

21  I'm trying to figure out what it is.

22          MR. TROYER: All right.

23          THE COURT: And I think you're dancing around it. I

24  think you want me to punish him for what happened to

25  Coleman --

9

1          MR. TROYER:  No, excuse me, I'm not dancing around

2     anything.  No, not at all.

3          THE COURT:  Well, do you agree he shouldn't be

4     punished for the arson murders of the Coleman --

5          MR. TROYER:  Of course --

6          THE COURT:  -- family?

7          MR. TROYER:  -- yes.

8          THE COURT:  We all know it happened, but I don't

9     punish him for that --

10         MR. TROYER:  Because --

11         THE COURT:  -- just --

12         MR. TROYER:  Yes.

13         THE COURT:  -- just for threatening -- just for

14    telling his brother to make sure he behaved?

15         MR. TROYER:  He should be punished for the threats,

16    but not for the murders.

17         THE COURT:  Okay.  Go on.

18         MR. TROYER:  All right.  In essence, I believe that

19    the actions taken by this Defendant merit a Guidelines

20    sentence, a sentence within the recommended Guidelines as

21    calculated by the U.S. Probation Office.  I know that there

22    are some issues that go toward the Defendant's favor in the

23    sense that Judge McLaughlin had already held him accountable

24    for some of the threats as to the other witnesses, but I

25    think the threats against Mr. Coleman are serious and

1   counterbalance that.

2        I also think there's some other issues here too as

3   well that counterbalance the defense request for a lower

4   sentence.  And one of those issues is the fact that this --

5   the nature of these threats against incarcerated witnesses

6   itself.  It's an especially heinous crime because these are

7   people who really have nothing outside of the walls except

8   their own family members, and these types of threats just

9   terrorize witnesses.  They terrorize the witnesses

10  themselves, and they also act as a deterrent and a

11  terroristic deterrent toward other potential witnesses within

12  the prison walls.  And of course it also, as the Probation

13  Office has noted as well, it also bears mentioning that the

14  Defendant committed these crimes while he was being held in

15  pretrial detention in the Federal Detention Center.  That is

16  a factor that's not taken into account in the Guidelines, but

17  it's a factor that your Honor can and, I submit, should take

18  into account as well.

19        So we're not asking for a sentence above the

20  Guidelines --

21        THE COURT:  How did the Detention Center devise a

22  building where you could communicate through the toilets?

23        MR. TROYER:  This toilet bowl communication is -- it

24  is a devious construction that has been made by the -- I

25  doubt that anybody who devised that building thought ahead of

1    time that people might actually scoop out the water in the

2    toilets and use that as a communication device, but that is

3    in fact what happens within the Detention Center these days.

4        THE COURT:  Well, as a matter of curiosity, once it

5    was discovered, isn't there anything you can do about it?

6    That seems as great a threat to public safety as anything

7    else we've talked about.

8        MR. TROYER:  I really don't know the answer to that

9    question.  I know it's been a concern, I know it's been a

10   problem.  I don't, frankly, think there is much that can be

11   done, that I know of anyhow.

12       THE COURT:  Well, of course we wouldn't expect you

13   to know --

14       MR. TROYER:  I'm not a plumber.

15       THE COURT:  -- it would be architects or engineers.

16       MR. TROYER:  Right.

17       THE COURT:  But it's certainly a public safety

18   concern that someone ought to be worried about.

19       MR. TROYER:  It is.

20       THE COURT:  All right.  Is that all?

21       MR. TROYER:  Essentially, yes, your Honor.  We're

22   simply -- what we're asking the Court to do is to make -- and

23   I know -- I think what the whole argument today is going to

24   come down to is whether his sentence should be concurrent or

25   whether it should be consecutive, or at least partially

12

1   consecutive.

2          I will submit to you, your Honor, that this

3   Defendant who sits before you, it's 2010, he's 41 years old,

4   his criminal history dates back or at least is documented

5   back to 1985.  This Defendant has been a criminal basically

6   his entire life, I would say adult life, but it even started

7   before that.  There is no -- there is nothing this Court can

8   give this Defendant, there's no amount or degree of verbal

9   chastisement that's going to affect this Defendant at all.

10  The only thing this Court can give this Defendant that's

11  going to mean anything to the Defendant himself is time.  And

12  if this Court gives concurrent time, it's essentially

13  tantamount to no sentence at all.  Another conviction isn't

14  going to mean anything to Dawud Bey, another, you know, $100

15  on the special assessment isn't going to mean anything to

16  Dawud Bey --

17          THE COURT:  Oh, that reminds me.

18          MR. TROYER:  Yes.

19          THE COURT:  Under the guilty plea, he was supposed

20  to pay that at the time of sentencing; has he?

21          MR. TROYER:  I don't believe -- I'm seeing an

22  indication from someone --

23          MR. JOSEPH:  He has not, your Honor.

24          MR. TROYER:  -- that he has not yet paid that.

25          THE COURT:  How do we take account of that?  The

13

1    guilty plea was very specific.

2        MR. JOSEPH:  Right now, he has -- I'm sorry, your

3    Honor.  Right now, he does not have the financial means with

4    which to do it, because he's incarcerated, your Honor, and

5    his family doesn't have the money to pay it.

6        THE COURT:  Isn't he working in prison?

7        THE DEFENDANT:  Not at FDC.

8        MR. JOSEPH:  Not -- he's been at the FDC, your

9    Honor, he can't work at the FDC -- well, he hasn't been

10   working at the FDC.

11       THE COURT:  All right.  I would caution you about

12   putting those things in guilty plea agreements when there's

13   no possibility that the Defendant can comply.  It happens a

14   lot with the 5K1s where someone agrees to pay, everybody

15   knows they can't pay, the Government has a reason to deny the

16   5K1 before they give it.  So, all right, I will make a

17   finding that he's unable to pay the $100 at this time, but he

18   still owes it.

19       MR. JOSEPH:  Thank you, your Honor.

20       THE COURT:  And the thing that's holding him there

21   is the fact that he hasn't been sentenced.

22       MR. JOSEPH:  Correct.

23       THE COURT:  So now that he'll be sentenced, he can

24   be moved out to a regular correctional institution where he

25   can get a job; isn't that correct?

14

1          MR. JOSEPH:  That is correct, your Honor.

2          THE COURT:  All right.

3          MR. TROYER:  I would just finish up or summarize by

4    saying that this Defendant -- and I've read his previous

5    sentencing transcript and he was very eloquent at his last

6    sentencing.  He talked about certain great and wonderful

7    things he had done in the community and what he intended to

8    do in the community in the future.  I submit that that is

9    more than counterbalanced by his criminal actions that he's

10   undertaken.  And I think his own words are the words that

11   really show his true self, and those words deal with his

12   intent for committing -- you know, committing future crimes.

13   And in his own words Mr. Bey said, he threatened to, quote,

14   "kill every fucking rat," end quote, that he knows upon his

15   release from prison.  I think this is -- you know, this shows

16   what Mr. Bey is really about, this shows that --

17         THE COURT:  Let's hope not.

18         MR. TROYER:  Well, hope springs eternal, as they

19   say, but I --

20         THE COURT:  So far we only sentence people for what

21   they've already done, not what they intend to do in the

22   future.

23         MR. TROYER:  Right.  And I think, taking that into

24   account, we also have to take into account obviously his

25   criminal history.  I think we do take into account, though,

1    his dangerousness to society and we punish those actions.

2    And I think, as a matter of punishment, as a matter of

3    specific deterrence to Mr. Bey, and even as a matter of some

4    general deterrence to others who might threaten witnesses,

5    particularly incarcerated witnesses, it's important that a

6    consecutive sentence be meted out to Mr. Bey.

7              THE COURT:  Thank you.

8              MR. TROYER:  Thank you.

9              THE COURT:  Counsel?

10             MR. JOSEPH:  Thank you, your Honor.

11             Your Honor, I'd like to break up my discussion with

12   you into two parts.  The first part, I'd like to address

13   briefly some of what Mr. Troyer has discussed today, and some

14   of what the Government has done thus far in this case.  And

15   then the second part is I'd like to address also Mr. Troyer's

16   points about Mr. Bey's character, and he's going -- Mr. Bey

17   can more eloquently describe his character and describe what

18   he has done since he's been sentenced for the initial crime.

19             But I think that it's important to note and I think

20   it's being glossed over here that Mr. Bey is not here before

21   you with these threats having been made a year ago, two years

22   ago, and you are now -- he is now being sentenced for the

23   first time and the Court is now addressing for the first time

24   what has taken place.  The genesis of these threats date back

25   to the year 2003.  And it's interesting to note that the one

16

1    aspect or the primary aspect that Mr. Troyer focused on today

2    was something that happened with the Coleman twins, and this

3    thing that happened with the Coleman twins occurred in 2003.

4    We are now at 2010.  Now, in 2003, Mr. Bey was not in the

5    Federal Detention Center here, he was not in Federal custody,

6    he had not been arrested, or nothing was going on in 2003.

7    But these threats, the Government contends and Mr. Bey pled

8    guilty, occurred in 2003.

9         Now, if we fast forward, we get to 2004, where Mr.

10   Bey pled guilty to Judge McLaughlin for the underlying drug

11   offense.  And then we fast forward to 2006, where --

12        THE COURT:  I wonder if it wouldn't be fairer to you

13   and to the Government if I shared with you some of the

14   information I obtained from the Bureau of Prisons.  At the

15   present time, Mr. Bey is due to be released July 9th, 2013.

16   It would have been a lot earlier if he hasn't lost 179 days

17   of his good time for whatever his misbehavior is in prison.

18   There is no sentence within the Guidelines that would amount

19   to any additional time for Mr. Bey.  In other words, the

20   Guidelines are 33 to 41, even a 41-month sentence would --

21   concurrent sentence would mean that he would serve no

22   additional time for this offense.  He would still get out

23   July 9th, 2013.

24        I think that's everything I learned that I haven't

25   told -- that I haven't shared with you.

1     MR. JOSEPH: Thank you, your Honor, thank you.  And
2   that sort of dovetails with the point that I'm making or that
3   I'm attempting to make to your Honor, and that is that, at
4   the time of his sentencing, the Government -- at his original
5   sentencing in front of Judge McLaughlin, the Government had
6   all the information that they brought up at the time of that
7   sentencing that they have now included in the indictment for
8   which we are currently here, all of this information,
9   including the information that the Government brings to your
10  attention today to suggest to you that Mr. Bey hasn't been
11  punished for.  But what we have is the Government -- and I'm
12  not putting any nefarious intent on the Government's behalf,
13  and I think this dovetails with what I argued during the
14  motion to dismiss that I filed -- and I understood that there
15  was a -- there's a Supreme Court case that was right in front
16  of and blocking my motion to dismiss the indictment -- I
17  understand that and I understand that your Honor's hands were
18  tied, even if you wanted -- even if you were inclined to
19  dismiss the indictment, you couldn't do it because of the
20  Supreme Court case.  I understand that fully, I get that
21  fully.
22      But what we have now to look at is not so much the
23  Supreme Court case that's standing in front of us, but we
24  need to look at what has occurred with Mr. Bey and what it is
25  that the Government has done.  And it seems like it's a form

18

1    of Chinese water torture, if you would, that has been going

2    on here.  That is, the Government has had this body of

3    information from 2003 and they chose to bring a little bit of

4    it in front of Judge McLaughlin for the purpose of getting an

5    enhancement, and they were successful in doing that.  They

6    got the enhancement with Judge McLaughlin and whether it's 42

7    or 48 months -- and I concede, it was 40 -- if we listen --

8    if we read the words of the transcript, he received an

9    additional 42 months for what the Government brought to Judge

10   McLaughlin at that time.

11          Then the Government brings you an indictment in this

12   case and they suggest that Mr. Bey be punished for threats

13   that occurred as early as 2003, going through 2004, while

14   he's being held, they indict him for that.  And at the time

15   of his plea of guilty they make reference to these threats to

16   the Colemans, which occurred in 2003.  Now, these are things

17   they clearly could have brought to Judge McLaughlin's

18   attention at the time of the enhancement, but I would suggest

19   that had they done that, the threats to the Colemans are no

20   different than the other threats that Judge McLaughlin

21   considered and so that time would have been along with that.

22   However, they've waited now to bring it to your attention now

23   in an effort to get you to go above and beyond what the

24   defense is asking you to do.

25          What the defense is asking you to do is to look at

1    -- and I haven't brought any witnesses in for you because at

2    the initial sentence Mr. Bey spoke eloquently and he had, I

3    believe, witnesses speak eloquently to what he has done in

4    the community.  That's not what I want you to consider, your

5    Honor.  What I want you to consider, your Honor, is what he

6    has done since he has been incarcerated.

7         Now, at the time of his sentencing, Judge McLaughlin

8    asked Mr. Bey to do two things.  Judge McLaughlin asked Mr.

9    Bey to get his high school GED and Judge McLaughlin asked Mr.

10   Bey to enter into a drug treatment program.  Both of those

11   things, both of those situations existed prior to his being

12   sentenced by Judge McLaughlin, and Judge McLaughlin correctly

13   noted that those were two things that were standing in the

14   way of Mr. Bey doing everything that he could to be all he

15   could be, essentially.  And I hate to use -- quote the term

16   used about the Army, but that's essentially what it was and

17   Judge McLaughlin realized that.  So what did Mr. Bey do?  Mr.

18   Bey did that.  He got his GED while he was in prison, Mr. Bey

19   entered into and successfully completed a drug treatment

20   program while he was in prison.  Mr. Bey entered into and

21   successfully completed numerous other programs while he was

22   in prison, and he'll speak to those programs.  These are all

23   things he did to follow Judge McLaughlin's directives and to

24   go above and beyond Judge McLaughlin's directives.  These are

25   all things which I believe speak volumes to the person that

1    Mr. Bey has become.

2          Now, Mr. Bey didn't come before you at the time of

3    his sentencing and say, well, your Honor, you know, I didn't

4    do these things, I don't deserve to be punished for these

5    things, he didn't do that and I don't suspect he's going to

6    do that now.  He's going to stand in front of you and tell

7    you that, yes, he did these things that the Government

8    charged him with and accused him with, but he's also going to

9    tell you, or I'm going to tell you for him, that he has been

10   punished for those things already.  And I realize that there

11   are certain -- there are not certain -- there are legal

12   reasons that the Government is allowed to now bring these

13   charges against him and I don't dispute that, I don't dispute

14   that at all.  I'm not going to argue to you that the

15   Government did something wrong by bringing these charges,

16   what I'm going to argue and what I'm going to try to plead to

17   is your sense of fairness, Judge.  Mr. Bey has paid dearly

18   for the crimes that the Government now says he commits.

19         Now, the Government wants to make reference to these

20   threats to Mr. Coleman, but these threats existed in 2003,

21   nothing different has happened since then.  It's not like

22   after he was sentenced by Judge McLaughlin he went out and

23   threatened somebody else and there's new threats or anything

24   like that.  That's what -- these existed in 2003, they

25   existed in 2006 when he was sentenced, and these threats

1   existed at the time that he pled guilty to you.  He's a
2   different person now, he's a different person.  He has paid
3   dearly for what he has done, he paid dearly for and
4   appropriately -- he's not going to tell you that his original
5   sentence was inappropriate -- he paid appropriately for the
6   underlying drug offense.  He would have received a sentence
7   in the 70-plus-month range, he's already served that
8   sentence.  He's been in prison for six years now, he's been
9   in prison for 72 months now.  And so if it wasn't over --
10  let's assume for the sake of argument Judge McLaughlin did
11  give him 78 months for the original drug offense, he'd be
12  coming up to the end of that now and it would be over, but
13  now we're going a step past that.  He is now going to serve,
14  as you correctly noted, additional time for the threats that
15  were made.  He's been punished for it.  He's not asking for a
16  pass, he's not asking you to disregard what he did, he's not
17  asking you to do that, he's just asking you, from a sense of
18  fundamental fairness, not to punish him again for what he's
19  already been punished for, your Honor.
20              THE COURT:  Well, isn't the question what he's been
21  punished for?  And I wonder if the Government would want to
22  respond.  If the Sentencing Guidelines are 33 to 41 months
23  and you want me to impose a sentence within the Guidelines,
24  but Judge McLaughlin has already imposed an extra 42 months,
25  which is more than the Guidelines, how can I impose a

1    consecutive sentence in the interest of fairness?

2            MR. TROYER:  Well, you can take into account the

3    actions that were not taken into account by Judge McLaughlin,

4    which is specifically the threats to Eugene Coleman --

5            THE COURT:  And you think --

6            MR. TROYER:  -- and his family.

7            THE COURT:  -- if she heard about the threats to

8    Eugene Coleman she might have imposed an even higher

9    sentence, is that your position?

10           MR. TROYER:  I think so, and here's why.  And this

11   also addresses the point made by defense counsel, is that

12   while it has taken some time from 2004 or so, thereabouts,

13   and then 2006 when he was sentenced, to 2009 when Mr. Bey was

14   indicted, I think the reasons for the delay are obvious.

15   There's a much larger case that was being presented, and a

16   much larger case that was indicted and being investigated at

17   the same time that these matters were being investigated, and

18   those matters were not ripe to be brought before any court,

19   be it Judge McLaughlin or your Honor or any other judge, back

20   then and those matters were only ripe to be brought for

21   indictment once the larger case was indicted.  Clearly, we

22   would not want to take some of the same witnesses that we

23   would present in the larger RICO murder case and present

24   those in a prior case in front of a different tribunal, it

25   wouldn't make sense from an investigative standpoint.  So

23

1    that's why it was done.

2          I think it certainly makes sense for the Court to

3    take into account now those matters which were not taken into

4    account before, especially for such a heinous crime.  And

5    witness tampering, you know, may not be the most heinous

6    crime around, but these are not just idle threats.  It's not

7    boasting, it's not puffing, it's not bragging, it's not just

8    prison talk, these were threats made to somebody and then

9    those threats were carried out, not by this Defendant, but

10   they were carried out by his coconspirator and others, as

11   charged in the other indictment.  Those threats -- and those

12   six people were actually murdered.  And then after they were

13   murdered, he still continued to threaten witnesses, and I

14   think this is something that the Court can take into account.

15   Those --

16          THE COURT:  There were threats after Judge

17   McLaughlin's sentence?

18          MR. TROYER:  No, there were threats after the

19   murders.  The murders occur October 9th, 2004, so there were

20   threats charged in this indictment -- most of the threats

21   that he's charged with occur in -- after the murders occur,

22   because it was -- most of those threats are captured by a

23   wiretap, a court-authorized interception order that is put

24   into place only after the arson murders occur.  Most of those

25   threats are captured in November, December of 2004, and even

24

1    into January of 2005, and that's -- those are the threats

2    that are recounted in the indictment.

3         So he was still under investigation back then for

4    some of these other threats and those threats are now being

5    brought before you, so I believe they can be taken into

6    account.  The Court is certainly not bound to take those 42

7    months and just say minus 42 from the current sentence and

8    then leave it at that, because that would be to ignore all

9    the threats as to -- that occurred as to Eugene Coleman.

10        And as Counsel also pointed out, Mr. Bey was indeed

11   out.  Some of these threats, the first threats occurred when

12   he was still out on the street, when he himself approached

13   Vernon Coleman and made the threat to Vernon Coleman to have

14   Eugene Coleman change his testimony or not -- or rather not

15   testify at all, and then those threats continued after both

16   Mr. Bey and Mr. Savage were locked up in the FDC.  So I think

17   that your Honor can take those into account and your Honor

18   can certainly after -- even if your Honor were to take off

19   the 42 months that Judge McLaughlin gave, you could certainly

20   give additional time.  And whatever additional time, even if

21   it's less than the Guidelines, even if it's less -- something

22   considerably less than 33 months, that time should be

23   consecutive.

24             MR. JOSEPH:  Just very, very briefly, your Honor.

25             THE COURT:  You don't have to be very, very, very

25

1    brief, just say what --

2            MR. JOSEPH:  Okay, I'm sorry --

3            THE COURT:  -- is important.

4            MR. JOSEPH:  -- your Honor, but I feel constrained

5    to respond to Mr. Troyer again.

6            THE COURT:  I would like you to.

7            MR. JOSEPH:  Because, I mean, I've really held back

8    from saying this, Judge, but this is clear manipulation by

9    the Government, your Honor, it's clear and patent manipu --

10   it can't be looked at any other way.  And I've tried to give

11   them the benefit of every doubt, but I can't do it, and when

12   we have Mr. Troyer arguing so vociferously for you to punish

13   Mr. Bey for something that happened in 2003 and they had this

14   information in 2003, and he says that the key time is 2004

15   when this arson took place.  And, again, he keeps mentioning

16   the arson, but he keeps telling us that Mr. Bey had nothing

17   to do with the arson.  Well, then why are we mentioning the

18   arson if Mr. Bey had nothing to do with the arson?  He knows

19   how volatile that is, he knows how horrible that was.  But he

20   also knows that Mr. Bey had nothing to do with it, but he has

21   no choice but to keep bringing it up to you, your Honor.

22           And the point I'm trying to make, your Honor, is

23   that he had this information in 2006 at the time of Mr. Bey's

24   original sentencing, he didn't bring it to the judge, for

25   whatever reason he didn't bring it to the judge, and now he

26

1   has the audacity to tell you that he thinks -- you don't have

2   Judge McLaughlin here -- he thinks that this would have made

3   a difference to Judge McLaughlin and she would have given him

4   more time.  We can't do things based on speculation.  The

5   Government had an obligation to bring everything -- just from

6   a sense of fairness, to bring everything together and throw

7   it at Mr. Bey at one time, but they're doing it bit by bit by

8   bit.  And I would suggest --

9          THE COURT:  Did the murders come up at all at the

10  trial before Judge McLaughlin?

11         MR. JOSEPH:  They were referenced, just like they're

12  being referenced now.  They can't help themselves, they keep

13  referencing them, just like they're being referenced now to

14  you.  And they keep -- and the thing is, when you look at

15  whatever document is filed by the Government or anyone else,

16  you have arson, murder, murder, murder, and then you have a

17  small footnote at the bottom, oh, but by the way, Mr. Bey had

18  nothing to do with these arsons, murder, murder, murder.

19  Well, yes, they were brought up, your Honor, and they're

20  going to continue to be brought up.  And there's no evidence

21  whatsoever, there's not a scintilla of evidence that Mr. Bey

22  had anything to do with it, but they're continually trying to

23  punish him for something that he had nothing to do with.

24         And that's why I keep saying that we have

25  manipulation here by the Government, your Honor.  For them to

1  bring something that happened in 2003 to your attention today
2  is just patently unfair, Judge.  And I believe that you
3  should follow our request, our plea, that you look at this
4  fairly and sentence him in accordance with what has already
5  been done, and to run the time consecutively, your Honor --
6  concurrently, I'm sorry.

7           THE COURT:  Did you wish to address the Court, Mr.
8  Bey?

9           THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  You may do so.

11          THE DEFENDANT:  Thank you.  Can I stand up, do you
12  want me to stand up?

13          THE COURT:  As you wish.

14          THE DEFENDANT:  Here or right here?

15          THE COURT:  Whichever you're more comfortable.

16          THE DEFENDANT:  Right in front.  Your Honor, I
17  thought of many things that I wanted to say, but at the end
18  of the day it was my heart that spoke the loudest to me, and
19  today I decided to allow the sincerity of my heart raise
20  above my intellect.

21          I stand here today in reflection of the history of
22  my life.  I see a person who made mistakes, but I always was
23  willing to seek repentance for my actions.  I stand here not
24  willing to beat myself down with guilt, because I also stand
25  here with a good understanding of the laws of attraction.  We

1  live in a universe of absolute laws, a world that operates on

2  every level and in every detail with absolute precision.

3  Therefore, I know that everything happens for a reason.

4      As I continue to grow, I pray that I will gain a

5  better understanding of the fundamental truth of the laws of

6  attraction.  I believe that everything I have been through in

7  my life has allowed me to grow and develop into the man that

8  I am today.  The things that I experienced throughout this

9  investigation has been a positive influence over the choices

10  and decisions that I will make in the future.  Every day I

11  work hard to prepare myself for my reentry back into society.

12  It's crystal clear that my past is no longer part of my

13  future.

14      Getting my GED, as I did in 2009, will afford me the

15  opportunity to make a smooth transition back into my

16  community.  Taking part in the nonviolence programs has

17  helped me develop a better -- to develop better conflict and

18  resolution skills.  Every day I read and study at the

19  marketplace to see exactly where I fit in with all of the

20  opportunities that I see in the business world.  The pre-

21  release class at Schuylkill FCI taught me better ways to

22  navigate my family and I to a better financial future.

23  Education has given me more confidence and now I know what to

24  do and exactly how to make better decisions.

25      One of the best decisions I made was starting Point

1   Breeze Youth Development Corporation.  This youth and urban

2   development program has a socially redeemable concept that

3   has helped hundreds of children to get the support from the

4   community through our basketball and after-school programs.

5   Since becoming more academically astute, I will be able to

6   take Point Breeze Youth Development to a higher level of

7   community involvement.  For my involvement with the Point

8   Breeze Youth Development, I was able to help a lot of young

9   inmates during my six years of incarceration to refocus and

10  get prepared for their reentry back into society.

11          Your Honor, I'm pointing these achievements out not

12  to pat myself on the back, but only because they should speak

13  volumes to my overall progress towards rehabilitation.  I

14  still have some prison time left and by then, 2013, I will be

15  cleansed of all the residue of my past.

16          In closing, I think it's important, your Honor, that

17  you know that at no time did I not want to accept my

18  responsibility for my actions.  I have great respect for the

19  job that Mr. Troyer has done throughout this investigation.

20  Nonetheless, some of the evidence he introduced at the plea

21  hearing was shocking, to say the very least.  For one, in

22  2003, I had no idea that I was going to be indicted, nor was

23  Mr. Savage indicted at the time.  Therefore, it was no reason

24  for me to threaten or approach anyone, let alone show anyone

25  a gun to make my point.  So again, this information was new

30

1    to me and it's outright -- and it's an outright lie.

2           In addition, I wanted to make certain I plead to the

3    right count of this indictment, because as you are well

4    aware, your Honor, the PSI Probation Officer could have asked

5    for enhancements based upon the severity of the threats.  So

6    at no time did I not want to accept my responsibility.  You,

7    your Honor, has made me feel comfortable that I could trust

8    you to make the final decision in this chapter of my life.

9           Thanks for giving me the opportunity to speak.

10          THE COURT:  Thank you.  I wanted to raise with you

11   the financial matters discussed at Paragraph 81, "Financial

12   condition/ability to pay."  Mr. Bey has had a bankruptcy

13   before his -- dismissed on May 1st, 2005.  He owns some

14   property, three properties.  What is the position of the

15   Government as to his ability to pay a fine?  There's no

16   restitution.  Do you have a position on the fine?

17          MR. TROYER:  Just some short time ago it was

18   represented that he didn't have $100 to pay for a special

19   assessment.  I don't --

20          THE COURT:  Well, that's cash, property can be sold.

21          MR. TROYER:  Right.

22          THE COURT:  I don't know.  Does he still own

23   properties?

24          MR. JOSEPH:  Yes, your Honor.

25          THE COURT:  What, the rental income is being used to

31

 1   support his family, is that it?

 2           THE DEFENDANT:  Yes.

 3           MR. JOSEPH:  Yes, your Honor.

 4           MR. TROYER:  To answer the Court's question, I'm

 5   certainly in favor of a fine.  I don't know how much of an

 6   effect it would have on Mr. Bey, I doubt that it would be

 7   paid, but -- quite honestly, but I certainly don't have any

 8   objection to the Court imposing one.

 9           THE COURT:  Well --

10           MR. JOSEPH:  And I think he's currently paying a

11   fine that was imposed by Judge McLaughlin as well, I think

12   there's a 2,000 --

13           THE COURT:  Judge McLaughlin imposed a $2500 fine.

14           MR. JOSEPH:  I think it's until --

15           THE COURT:  But he doesn't have a job in prison.  If

16   he goes to a regular facility, he'll earn at least $300 a

17   year, and usually half of it is paid towards your financial

18   responsibilities under the statutes.

19           MR. JOSEPH:  And he's paid 500 down from the 2500,

20   your Honor.

21           THE COURT:  Okay.  I would like to speak to the

22   Probation Officer, please.  And, Ms. Ward -- oh, are there

23   any conditions to his supervised release that Judge

24   McLaughlin imposed?  In other words, when he gets out, '13,

25   he has, what, two or three years of supervised release?

1          MS. HUNT:  Your Honor, it's three years of

2     supervised release and --

3          THE COURT:  Are there special conditions?

4          MS. HUNT:  I have a $2,000 fine, not a $2500 fine.

5          THE COURT:  Oh, well --

6          MR. JOSEPH:  I believe Mr. Bey has --

7          THE DEFENDANT:  It's five years --

8          MR. JOSEPH:  -- has five years --

9          THE DEFENDANT:  -- of supervised release.

10         THE COURT:  I can't hear you.

11         MR. JOSEPH:  I'm sorry.  I believe it's -- Mr. Bey

12    is indicating that he believes it's five years supervised

13    release that was ordered by Judge McLaughlin.

14         THE COURT:  Yeah, but what I want to know is are

15    there special conditions of the supervised release --

16         MR. JOSEPH:  Oh, I understand, your Honor.

17         THE COURT:  -- beyond the standard?  Usually --

18         MR. JOSEPH:  I don't believe so, your Honor.

19         THE COURT:  -- you can't have a gun and you can't

20    travel outside the district, and so on and so forth, and you

21    have to report.  But sometimes there are conditions like you

22    can't have a credit card or you can't have a passport, and I

23    don't know if there are special conditions.

24         MS. HUNT:  No, it's just the fine, your Honor, and

25    the Defendant was ordered to pay it while in custody and then

1   once out on supervised release.

2           THE COURT:  All right.

3           MS. HUNT:  He doesn't have any personal problems

4   like substance abuse or anything like that.

5           THE COURT:  Well, he's -- while he's been in prison,

6   he's had some alcoholic rehabilitation; isn't that correct?

7           MR. JOSEPH:  Alcohol and drug rehabilitation, your

8   Honor.

9           THE COURT:  Okay, so that he must have some personal

10  problems.

11          MS. HUNT:  The Defendant has participated in

12  numerous classes and the one that he participated in is the

13  40-hour general education classes for substance use and

14  abuse.

15          THE COURT:  Yes.  Is there any -- I want to be clear

16  about what he's been doing while he's been in prison.  He's

17  taken the 40-hour special --

18          MR. JOSEPH:  Yes, your Honor.

19          THE COURT:  And anything else?

20          MR. JOSEPH:  Yes, he's taken several other classes,

21  and I believe that --

22          THE COURT:  Would you tell me about that?

23          MR. JOSEPH:  -- it was referenced -- may he or --

24          THE COURT:  Yes, please.

25          MR. JOSEPH:  Thank you, your Honor.

34

1          THE DEFENDANT:  Well, as I mentioned, your Honor, I
2     completed the drug program, as you know --
3          THE COURT:  Yes.
4          THE DEFENDANT:  -- and I completed the non -- Your
5     Choice, it's a nonviolence program.  And I also taught a
6     public speaking class and I participated --
7          THE COURT:  You took it or you taught it?
8          THE DEFENDANT:  Excuse me?  I taught it, here at FDC
9     Philadelphia while I was here, within the last five months.
10     So there's been a lot of programs that I just --
11          THE COURT:  Where have you been in custody during
12     the --
13          THE DEFENDANT:  At first I went to Hazelton USP,
14     then I went to Schuylkill FCI.
15          THE COURT:  Didn't you have a job there?
16          THE DEFENDANT:  Yeah, I had a job, but I was getting
17     paid like $5 --
18          THE COURT:  Well, they don't pay you as if you were
19     not in prison --
20          THE DEFENDANT:  You're right.
21          THE COURT:  -- the pay is low.  But --
22          THE DEFENDANT:  They paid me $5.
23          THE COURT:  -- I thought you said you didn't have
24     any job because you were over here at the Detention Center
25     the whole time.

35

1          THE DEFENDANT:  Exactly.

2          THE COURT:  For seven years?

3          THE DEFENDANT:  No.  I was incarcerated for seven

4     years, but since this indictment I've been back down here at

5     FDC Philadelphia.

6          THE COURT:  Well, I understand that, but I was

7     trying to find out when you were in a place like Schuylkill,

8     did you have a job --

9          THE DEFENDANT:  Yes.

10          THE COURT:  -- and the answer is yes.

11          THE DEFENDANT:  I worked in the kitchen and in the

12     laundry.

13          THE COURT:  All right.  Have you been any place

14     other than Schuylkill?

15          THE DEFENDANT:  USP Hazelton, which was my first

16     stop after --

17          THE COURT:  Which was that?

18          THE DEFENDANT:  USP Hazelton --

19          THE COURT:  Ah, okay.

20          THE DEFENDANT:  -- which is in West Virginia.

21          THE COURT:  Yeah.

22          THE DEFENDANT:  That was the first institution that

23     I went to, and then I went to Schuylkill FCI.  And I never

24     had a job at --

25          THE COURT:  Hazelton?

1          THE DEFENDANT:  -- at Hazelton.

2          THE COURT:  Because you were only there temporarily

3    in transit.

4          THE DEFENDANT:  Exactly.

5          THE COURT:  They never take you directly where

6    you're going.

7          THE DEFENDANT:  Right.

8          THE COURT:  Have they talked to you about any

9    release planning at all?

10         THE DEFENDANT:  Well, I've done -- also I've done

11   the pre-release class that teach you about how to set up your

12   resumes and how to do job interviews and different things to

13   that extent.  So I've also participated in the pre-release

14   classes too.

15         THE COURT:  Is it now -- do you know, is it the

16   practice of the prisons now to routinely have halfway house

17   release?

18         THE DEFENDANT:  Well --

19         THE COURT:  At one point, they would let you out six

20   months early to a halfway house.

21         THE DEFENDANT:  Yes.

22         THE COURT:  Are they still doing that?

23         THE DEFENDANT:  Well, at Schuylkill it's been a

24   problem, because a lot of times -- I guess Schuylkill is like

25   a -- almost like a transit center, so many people coming and

1   going so much there, it's been hard for the administration, I

2   believe, just giving them the benefit of the doubt, to

3   accommodate people and get them in the halfway house, for

4   them to be able to do the six-month halfway house.  They've

5   been giving guys 20 days, 40 days, sometimes you get three

6   months.  You're real lucky if you get six months halfway

7   house at this particular institution.

8           THE COURT:  Thank you.

9           (Discussion held off the record.)

10          THE COURT:  Mr. Bey, it's never easy to impose

11  sentence on another human being, but it's a very serious

12  matter because I have to, as you mentioned, be fair to you,

13  but I have to protect the public as well.  We've talked about

14  the Guidelines.  And you have -- in the seven years you've

15  been prison, you've done an awful lot of good things.

16  They're in the presentence report, it's much more than you

17  said.  You've taken all sorts of courses and done a lot to

18  improve yourself.  But I can't account for why you've lost

19  179 days of good time.  When I called the prison, I'll

20  confess to you, that was the first thing they told me.  I

21  guess they sensed that I wanted to be fair and give you a

22  break, if I could under the law, and they don't have you

23  tagged as a law-abiding citizen yet.

24          So that I think you have to consider that, and

25  that's why I asked about the conditions of supervision.  When

38

1   you get out, you have a period of supervised release under

2   the law, it's for this two to three years, but you have five

3   years for Judge McLaughlin.  But I was trying to think of

4   what conditions would help you lead a law-abiding life,

5   because it's obvious that, if you wanted to, you could.  You

6   have a lot of skills that enable you to be successful in

7   business, but the kind of business we want you to be

8   successful at is not drug dealing.

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And you have what we like to call anger-

11  management problems.  The first thing you want to do with

12  someone that you think is going to hurt you is kill them, or

13  threaten them or threaten their families.  That's not what

14  the law considers law-abiding.

15          And we have no dispute about the Sentencing

16  Guidelines, they're advisory.  Before I can impose a

17  sentence, I have to consider not just those, but I have to

18  consider other factors.  The first is the nature and

19  circumstance of the offense.  And I want to agree with the

20  Government on that, these are very serious, because it's no

21  secret that we have a problem in Philadelphia with witnesses

22  being unwilling to testify.  They're scared to death.  They

23  don't want their families killed, they don't want to be

24  killed.  And so we have people who are cool, as you seem to

25  call it; in other words, people who won't cooperate with the

1    police, people who let criminals get away with it because
2    they're afraid to say who did it or they saw it.  It is one
3    of our most serious problems in Philadelphia and it means
4    that people are not secure in their homes.  Law-abiding
5    people are afraid if they get shot no one will see that the
6    people who did it get their just desserts.  So it's one of
7    the most serious things you can do is to threaten people who
8    will cooperate with the police, and I agree with the
9    Government.
10        On the other hand, I consider your history and your
11   characteristics, and the possibility that you could be a good
12   citizen, if you wanted to, and the fact that you've been
13   trying pretty hard to show that in the seven years that
14   you've been in jail.  You have a family that you care for and
15   maybe the thought that you don't want to go back to prison
16   might convince you to behave yourself.
17        And I also think that you have been punished in part
18   for these threats by Judge McLaughlin's shock at what you did
19   and that's -- I feel the same.  When I read this indictment,
20   I was equally shocked.  So there was nothing wrong with her
21   doing what she did, she didn't know you were going to be re-
22   indicted for the threats to Coleman and all the others.  So
23   that the fact that she imposed an extra sentence on you has
24   to be taken into account, you have to get a break for that,
25   and I've been considering that very seriously.

40

1      So I have to consider the need for the sentence I

2  impose to reflect the seriousness of the offense, to promote

3  respect for the law, because if you get away with it other

4  people figure, well, what's -- you know, why shouldn't I?

5  And there isn't -- I don't think that the sentence will deter

6  you; it certainly punishes you for what you did, but there is

7  what we call general deterrence.  The fact that you go to

8  jail for a while for something occasionally keeps other

9  people from doing it.  Although I'll confess to you, I've

10  been a Judge over 30 years, and it's rare to find someone

11  coming up for sentence that isn't very apologetic, very sorry

12  for what they did, very sorry for what they've done to their

13  family and their children, and I wonder, why don't they think

14  of that before they do it?  And I haven't figured out the

15  answer, but I'm still trying.

16      Certainly, keeping you in prison will protect the

17  public from your doing any further crimes, maybe, although

18  you showed the capacity to threaten even while you were in

19  prison.  So I'm not sure that keeping you in prison does it.

20  It's getting you not to want to commit a crime anymore and

21  we're trying.

22      You've had quite a bit of educational and vocational

23  training, but you're a person with a lot of skills and

24  ability.  You were able to acquire properties and manage

25  them, and what we need to do is see that you have an

1   incentive to have a legitimate business and to stay away from

2   drugs.  So I don't think we need to keep you in prison to

3   have more educational or vocational training.  Thank

4   goodness, you don't need medical care.

5           I've certainly considered the kind of sentences

6   available.  And when you're on supervised release, my

7   supervised release for the three years, that will run

8   concurrent with Judge McLaughlin, but I will give the

9   Probation Office the authority to recommend to me that you

10  have mental health treatment, if you need it.  I'm not -- at

11  this point, we're not sure, but we'll see that you have an

12  evaluation, do what we can to help you, if you need the help.

13          I'm not going to impose at this point house arrest

14  or community service, because I think that you're impelled to

15  help the community without my forcing it.  But if you get in

16  trouble, if you don't get a legitimate job, I will keep you

17  -- I'll have you do community service for 20 hours a week, so

18  that you don't have idle time to figure out how to go back

19  into the drug business.

20          I think that I've considered the policy statements

21  of the Sentencing Commission and the purpose of the

22  Guidelines.  In particular, I've considered what is the least

23  severe sentence that will accomplish what I think needs to be

24  accomplished.

25          So I'm going to impose a sentence at the lower part

42

1    of the Guidelines, 36 months, but I'm not going to make it

2    completely concurrent and I'm not going to make it completely

3    consecutive.  I will split it in half, and I'll have 18

4    months concurrent, 18 months consecutive.  And that will be

5    less than 18 months if you can bring yourself to earn more

6    good time, which so far you've had a lot of difficulty doing.

7    But I think that this will inspire you to earn that good

8    time, because that will lessen the additional time you have

9    to spend after July of 2013.

10            So, pursuant to the Sentencing Reform Act of 1984,

11    it's the judgment of the Court that the Defendant, Dawud Bey,

12    is committed to the custody of the Bureau of Prisons, to be

13    imposed for a term of 36 months.  The term of the -- half the

14    term of the imprisonment imposed by this judgment should run

15    concurrently with the Defendant's term of imprisonment

16    pursuant to the judgment in Docket Number 04-269-05 of the

17    Eastern District of Pennsylvania and half shall be

18    consecutive.

19            Upon release from imprisonment, you will be placed

20    on supervised release for a term of three years, which will

21    run concurrent with the sentence mentioned above.

22            Within 72 hours of release from the custody of the

23    Bureau of Prisons, the Defendant shall report in person to

24    the Probation Office in the district to which the Defendant

25    is released.

43

1          While on supervised release, you can't commit
2     another Federal, state or local crime.  You're prohibited
3     from possessing a firearm, that's a separate felony, and you
4     can't possess an illegal controlled substance.  You shall
5     comply with other standard conditions adopted by this Court,
6     and you must submit to one drug test within 15 days of the
7     beginning of supervised release and at least two tests
8     thereafter, as determined by the Probation Office.

9          In addition, you will comply with the following
10    special conditions.  You will cooperate in the collection of
11    DNA, as directed by the Probation Office, and you will submit
12    to a mental health evaluation and participate in such therapy
13    as the Probation Office recommends, with approval of the
14    Court.  You can appeal that to the Court, if you wish.

15         You should be employed, that's a condition of
16    supervised release.  And if you're not employed or going to
17    school, then you have to perform community service for 20
18    hours a week.

19         You'll pay the United States a fine of $2,000.  I
20    find you lack the ability to pay a fine within the Guideline
21    range, and I'll waive interest in this case.  The fine is due
22    immediately, together with the $100 special assessment you
23    were supposed to have already paid.  I recommend you
24    participate in the Bureau of Prisons Inmate Financial
25    Responsibility Program, because that gets you a higher wage.

44

1    And you should provide a minimum payment of $25 a quarter

2    towards the fine.  If the fine isn't paid prior to the

3    beginning of your supervised release, you satisfy the amount

4    in monthly installments of not less than $25, to commence 30

5    days after your release from confinement.

6         After studying your financial situation and

7    providing a report to the Court, the report will set the

8    exact amount of the monthly payment that you're financially

9    able to make, taking into consideration your obligation to

10   your family.  If you haven't paid the fine, you have to

11   notify the United States Attorney for this District within 30

12   days of any change of mailing address or residence.

13        And you can appeal this sentence to the limit

14   provided in your guilty plea agreement and, if you can't pay

15   the appellate fee or your lawyer -- are you retained or

16   appointed?

17        MR. JOSEPH:  Retained, your Honor.

18        THE COURT:  You're retained.  Well, he'll file the

19   notice or the Clerk would, but as I think of it, you can only

20   appeal -- if the Government appeals, you can appeal anything,

21   but if the Government doesn't appeal, you -- my sentence is

22   not above the Guidelines, so you could only appeal if you

23   think the sentence is unreasonable.

24        You look puzzled or had some question?

25        MR. JOSEPH:  No, your Honor, I have no --

45

1        THE COURT:  All right.  Do you have any question?

2        THE DEFENDANT:  No.

3        THE COURT:  Does the Government have any question?

4        MR. TROYER:  No, your Honor.

5        THE COURT:  All right, thank you then.

6        MR. JOSEPH:  Thank you, your Honor.

7        THE COURT:  When you're on supervision, the

8   Probation Office will provide a report to the Court every

9   three months and, if I'm still here, I'll read it and

10  consider it, and have conferences with you occasionally to be

11  sure things are going well for you.  We really want you to

12  succeed --

13       THE DEFENDANT:  Okay, thank you.

14       THE COURT:  -- on your reentry.

15       THE DEFENDANT:  Thank you.

16       THE COURT:  Yes?  Do you want to dismiss the --

17  aren't you going to dismiss Counts --

18       MR. TROYER:  That's precisely what I was about to do

19  actually --

20       THE COURT:  Yes.

21       MR. TROYER:  -- yes.  Pursuant to the plea

22  agreement, I've prepared an order, I've showed it to Counsel

23  and to the Probation Officer, and I'll electronically file

24  the motion when I return to the office.

25       THE COURT:  That's all the counts except Count 1 are

46

1  dismissed?

2          MR. JOSEPH:  Yes, your Honor.

3          MR. TROYER:  2, 3, 4 and 5, right.

4          THE COURT:  As was agreed at the time you entered

5  your plea.  I'll sign that order now.

6          All right.  Thank you.  And thank you to all the

7  people who came to observe --

8          MR. JOSEPH:  Thank you, your Honor.

9          THE COURT:  -- for being here.

10          MR. JOSEPH:  Good afternoon, your Honor.

11          THE COURT:  Good afternoon.

12          MR. TROYER:  Good afternoon, your Honor.

13          MS. SYKES:  Thank you, your Honor.

14          (Proceedings adjourned at 3:26 o'clock p.m.)

15                          * * *

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Geraldine C. Laws_      _1/29/15_

Geraldine C. Laws, CET          Date
Laws Transcription Service